## 18728

Henry Abbott LANGSTON, Jr., Appellant, v. Marian Fail
LANGSTON, Respondent

(157 S. E. (2d) 858)

364

*Messrs. Yarborough, Parrott & Anderson,* of Florence, *for Appellant,*

*Messrs. Whaley, McCutchen, Blanton & Richardson,* of Columbia, and *Blatt, Fales & Peoples,* of Barnwell, *for Respondent,*

November 17, 1967.

BRAILSFORD, Justice.

In this action for divorce by Henry Abbott Langston, Jr., against Marian Fail Langston, the wife defended upon the ground that her adultery, which was assigned as the ground for divorce, had been condoned by her husband. The circuit court sustained this defense, denied the divorce sought by the husband, awarded primary custody of the three young children of the marriage to the wife, and required the husband to support the children and to pay alimony to the wife. The husband has appealed.

The testimony was taken before a special referee under a limited order of reference. He transmitted the record to the circuit court without findings or recommendations. There being no concurrent findings in this equity case, it is our duty to decide the issues of fact according to our view of the weight of the evidence. *McLaughlin v. McLaughlin,* 244 S. C. 265, 136 S. E. (2d) 537. However, this does not relieve the appealing party of the burden of convincing us that the circuit judge erred in his findings of fact. *Lee v. Lee,* 237 S. C. 532, 118 S. E. (2d) 171.

The parties were married upon the husband's graduation from medical school in 1957. She was a graduate nurse. The couple made their home in Aiken, South Carolina, where he is a busy general practitioner. They have one son, who was eight years old at the time of the references in 1965, and two daughters, then six and four years of age. Throughout the early years of the marriage, Mrs. Langston was a good wife and mother. Although she was dissatisfied with her husband's long work hours, he took some time off for recreation, and they had a reasonably active social life. They were apparently happy in their relationship until sometime after James Conn and his wife moved to Aiken in March, 1964.

An affinity soon developed between the Conns and Marian Langston. Within a short time, the frequency and length of the Conns' visits in the Langston home became burdensome to Dr. Langston, and he requested that his wife discourage them. Despite his disapproval, the visits continued. In May, 1964, Mrs. Langston made herself conspicuous by long absences with Conn from a beach houseparty. In July she foisted the Conns on her husband for two weeks at the beach, which he had planned as a family vacation, and again made herself conspicuous with Conn. In August two episodes came to Dr. Langston's attention involving Mrs. Langston and Conn, which took place at night while she was away from home on some pretext. Dr. Langston repri-

manded Conn and terminated any pretense of friendly relations with him. Although his relations with his wife had become strained, he made no accusations against her and, so far as the record discloses, did not upbraid or scold her in any way.

At about the time of these incidents, Mrs. Langston told her husband that she did not love him anymore and wanted a divorce; that she wanted to move out of the house, taking the children with her and have him support them elsewhere. When he urged her to try to save their marriage, or at least to stay together for the children's sake, she moved into, the guest bedroom and agreed to stay on condition that he would stay on his "side of the house" and she on hers.

For the remainder of 1964, Mrs. Langston was seldom at home when her husband arrived from work and several times each week would stay out until ten or eleven o'clock at night. She offered no explanations and was uncommunicative when he tried to talk with her. The children were usually cared for by a maid or a neighborhood baby-sitter until Dr. Langston arrived at home but were sometimes left without supervision. He had to do most of the grocery shopping, see to his own supper, and arrange for the care of the children when he responded to night calls. It is now conceded by all that this reversal in Mrs. Langston's conduct, which formerly had been marked by attentiveness to her husband and children, resulted from her preoccupation with Conn. Her unusual absences from home over some five months were occupied by clandestine meetings with him at secluded spots about the country side.

In response to her husband's inquiries as to whether her change in attitude was due to any fault of his for which he could make amends, Mrs. Langston stated that "it was not (his) fault particularly, it was just that it was all over—it was all dead" between them. He testified that he tried to keep the family together for the children's sake, hoping right to the last moment "that she would have some change of heart or mind * * * and * * * get back together."

The Conns moved to Sarasota, Florida, in early January, 1965, and Mrs. Langston's affair with Conn culminated in two assignations in that State, the first for the weekend of January 22 at Jacksonville and the second for the weekend of February 12 at Tampa. In each instance she left home on the pretext that she was going to visit a friend. By arrangement of Dr. Langston and his attorney, a detective witnessed the meeting between Mrs. Langston and Conn at the airport in Tampa, and Dr. Langston intercepted a revealing letter written to her by Conn on the day after her return to Aiken on Sunday, February 14. This action was commenced on February 22 by the service of the summons and complaint and an order awarding temporary custody of the children to Dr. Langston. Mrs. Langston moved out of their jointly owned home on that day and returned to the home of her parents in Charleston.

It is abundantly clear that at the commencement of the action Mrs. Langston was without the semblance of a defense. There is no merit in the claim that her husband's occupancy of the jointly owned home with her from February 14, when she returned from Florida, to February 22, when this action was commenced, impliedly condoned her conduct. The undisputed testimony is that during this period the husband and wife occupied separate bedrooms. There were no marital relations, and there was very little communication between them. Dr. Langston had resolved to divorce his wife and had placed the matter in the hands of his attorney. While the complaint was being drawn and steps taken to procure an order granting him temporary custody of the children, he chose not to confront her with his knowledge of her Tampa assignation. Inferably out of consideration for her recent mental state,[1] he arranged to have her mother present when the papers were served, which was done on the day that the custody order was issued by

---

[1] She had taken an excessive, but not dangerous, dose of sleeping pills after her first trip to Florida, and on her threat to take more, was sent to a psychiatric clinic in Augusta, Georgia, where she remained for about ten days.

the court. We think that the course followed by Dr. Langston was reasonable, in the best interest of the three young children and quite possibly in the best interest of his wife. It would be manifestly unreasonable and unjust to fashion implied condonation from such conduct, and we do not interpret the circuit decree as having done so.

The issue on appeal turns upon whether the preponderance of the evidence supports the circuit court's conclusion that the wife's adultery was condoned by the husband after the commencement of the action and before his rejection of her unilateral attempt to resume cohabitation in September, 1965. Until this attempt was made, the lawsuit had been dormant and the relationship between the parties friendly. Mrs. Langston was living with her parents in Charleston and was employed there as a nurse with two or more free days per week. Dr. Langston, by agreement of counsel, was paying her $300.00 per month as support *pendente lite*. She had unlimited visiting privileges with the children, who had been told that she was in Charleston to nurse their sick grandmother. She customarily spent her free days in Aiken with the children. Dr. Langston took her and them to various places of recreation. On a number of occasions, he took her out in the evening to dine at restaurants and clubs in the Aiken and Augusta area which were frequented by their friends. Dr. Langston spent a weekend in Charleston in May and another in June. On these weekends, he took Mrs. Langston fishing, and he took her out to dinner. During the last two weeks in July, Dr. Langston, the children and Dr. Langston's father occupied a beach house at the Isle of Palms. By prearrangement, Mrs. Langston obtained a leave of absence from work during this period and spent every day with the family. There is a sharp conflict in the testimony as to whether she also slept at the beach house. There is a similar conflict in the testimony as to whether the husband and wife engaged in sexual relations during the pendency of the action, and whether, after May 19, 1965, the wife occupied a bedroom with her husband on her visits to Aiken.

Within a few days after the beach trip, Mrs. Langston decided to return to Aiken permanently. She moved into a motel room there on August 4 and, after a week, moved into a friend's cottage, which was available for two weeks. Not having been able to find other suitable quarters in Aiken, she returned to Charleston at the expiration of this period. She then resolved to moved back into the family home in Aiken. Her attempt to do so on September 3 was repulsed, and the lawsuit was again agitated. By an amended answer filed October 15, 1965, Mrs. Langston for the first time formally admitted her adulterous conduct with Conn and pled condonation as a defense to the action.

Mrs. Langston testified that the service of the complaint for divorce had jolted her into realizing how much she loved her husband and children, and that her every thought and effort since then had been directed toward winning his forgiveness and rejoining her family. Whatever her feelings or motive, the record makes it clear that she has diligently sought a reconciliation. At her request and with the approval of his attorney, Dr. Langston met her in Williston within a week of the commencement of the action. She declared her feelings and sought his forgiveness. She testified that he then stated that he did forgive her, and that he would let her know in a few days about coming home. During the next two weeks they had two more meetings at which they discussed their affairs. She testified that on both of these occasions he again stated that he forgave her but didn't want her "to come back home right then because people were talking too much in Aiken." However, he did encourage her to come to visit the children.

Mrs. Langston returned to Aiken for the first time on March 27 for a four-day visit. Between that date and May 18 she was in Aiken on eight different occasions, and Dr. Langston was in Charleston on one weekend. With one insignificant exception, it is conceded that Mrs. Langston slept alone at a motel on these visits to Aiken. However, she claims to have remained at the Langston home until late

each night, and that she and her husband regularly engaged in sexual relations there before she returned to the motel. Commencing with the night of May 19, and on each night of three visits to Aiken between that date and the July 17th beach trip, Mrs. Langston claims to have shared a bedroom with her husband at the family home. She also claims to have shared a bedroom with him during the two weeks at the Isle of Palms.

Dr. Langston denies that he has had sexual relations with his wife since she moved out of their bedroom in August of 1964. He also denies that she has stayed overnight in the Aiken home since the commencement of the action, and he denies that she ever spent the night in the house at the Isle of Palms. He testified that the arrangement on her visits to Aiken and at the beach was the same. So that the young children would not become aware of the estrangement of their parents until necessary, she would remain at the home or beach house until they were asleep at night and return next morning before they awakened. He also related his rather frequent associations during the pendency of the action with his wife and children together and with his wife alone, which have already been recited.

During these remarkably friendly associations, Mrs. Langston continued to importune her husband to forgive her and to allow her to resume her place in the family home. She testified that he repeatedly told her that he did forgive her and wanted her back, but that he was not ready for her to return, that she should wait until things quieted down more in Aiken, that he was afraid the people in Aiken would not accept her back, and words of like import. Dr. Langston denied that he made any of these representations or in any way led Mrs. Langston to believe that he intended to accept her back as his wife.

The testimony of several other witnesses tends to corrorate one party or the other as to some portion of his or her testimony on the issue of condonation. We have carefully considered the evidence of such non-party witnesses and

find it to be about evenly balanced, lending no more support to the testimony of one party than to the other. We are left to base our judgment as to the credibility of the parties on what they themselves said and did in the light of admitted or established circumstances. We find Dr. Langston's testimony far more believable than that of his wife and are convinced that the circuit court erred in finding the facts according to her testimony.

Proof positive of Mrs. Langston's adultery and the commencement of the action followed her gross neglect and ill-treatment of her husband during more than six months. To say that we are impressed by his forbearance, even docility, during this difficult period is an understatement. Even so, he had been aroused to action and had formally charged her with adultery, upon sufficient evidence, in a complaint for divorce. It is simply contrary to human nature that on his next encounter with her, one week later, he should have declared that he forgave her and wanted her back as his wife. It would be illogical to credit her affirmation that such an improbability occurred and discredit his denial of it.

In the light of the reality that Dr. Langston never permitted his wife to move back into the family home, the linchpin of her story of their relationship pending the litigation is that he told her that she should postpone her return until the talk in Aiken subsided. Without some reasonable explanation of why her return to the family home, which she ardently desired, was never accomplished, her claim that he had forgiven her and wanted her back falls of its own weight. When weighed in the light of the conduct of the parties, as it must be in our search for the truth, the explanation resorted to is unconvincing and must be discredited. On her frequent visits to Aiken, which he encouraged, the couple, sometimes accompanied by their children and sometimes alone, openly resorted to places in the area which were frequented by their friends and acquaintances. She shopped for the children in Aiken stores, took them to school affairs, and supervised their birthday parties. On at least one occa-

sion at the Isle of Palms, they entertained Aiken friends who were vacationing there. It is obvious that these activities of the husband and wife were much more calculated to keep speculation and gossip concerning them stirred up than a forthright reconciliation would have been. Surely no man who was sensitive to gossip concerning his estranged wife would have, as she claims, habitually permitted her at his home until two or three o'clock in the morning and then allowed her to return alone to a motel room at that hour.

Three letters from Dr. Langston to his wife, dated respectively, April 15, 1965, June 3, 1965, and August 3, 1965, are in evidence. These are long handwritten letters, friendly, showing an interest in her welfare, full of news about himself, the children, pets, friends and patients. They all close with a conservative "affectionately." They contain no word of forgiveness or of love or of regret over separation or of wanting her back, and there is not a word in any of these letters, which span more than three months, about talk or gossip in Aiken or elsewhere. The August 3 letter, written within a few days of the family's return from the Isle of Palms, contains only this reference to that trip, "It was a real nice 2 weeks at the Beach." If the relationship between the parties during the pendency of the action had been as Mrs. Langston claims, and if Dr. Langston was living apart from his wife against his wishes, it is inconceivable that these letters would have revealed no inkling of it.

The action was never dismissed, and Mrs. Langston does not claim that her husband promised that it would be, or even that dismissal of it entered into their discussions. Mrs. Langston was fully aware that there had been no reconciliation of her marriage, which implies normal cohabitation of the husband and wife in the family home. She fully expected the resistance with which her attempt to resume cohabitation was met. When she moved her clothes into the house in Dr. Langston's absence, she offered to take the maid home before he arrived and told her that "there's going to be Hell here this afternoon."

For these and other reasons which need not be recounted we resolve the conflicts in the testimony on the issue of condonation in favor of Dr. Langston. We are convinced that Mrs. Langston has failed to sustain the burden of proving this affirmative defense by the greater weight or preponderance of the evidence.

Our satisfaction with the conclusion reached is fortified by these additional considerations. The wife's willful misconduct caused the disruption of this marriage and entitled her husband to a divorce. If we have erred in weighing the testimony on the issue of condonation, she is still the authoress of her own predicament. On the other hand, should we erroneously credit her testimony over his on this issue, we would deprive the innocent husband of the divorce to which he is lawfully entitled because of the wife's infidelity.

Dr. Langston charges that the court erred in awarding primary custody of the children to their mother, in requiring him to pay alimony to her, in awarding her attorney's fees, and in certain provisions of the order with respect to a savings account, an automobile and a diamond ring.

The children have been in the primary custody of their mother since May of 1965, and the record before us was compiled before that date. The order makes ample provision for Dr. Langston to share their custody on weekends and holidays. The evidence indicates that before and since the period of her lamentable infatuation with Conn, who has not been a problem since February, 1965, Mrs. Langston has been a loving and attentive mother and a woman of good moral character. We are not convinced that the circuit court erred in awarding the primary custody of these young children to her. The question of custody of the children and their support is always subject to re-examination in the circuit court. It would be indiscreet for us, under the circumstances here appearing, to switch their custody without contemporary information as to how the present arrangement is serving their interests.

The exception to the allowance of alimony to the wife must be sustained per force the statute. Section 20-113, Code of 1962.

After the hearings had been completed and before a final order was filed, the circuit court ordered Dr. Langston to pay $500.00 "as a partial payment on the fees and expenses admittedly owed by the plaintiff to the defendant's attorneys." There was no appeal from this order which became the law of the case. Under it, the only remaining question was the determination of an appropriate amount to be paid to Mrs. Langston's counsel for their services in the circuit court. There was no abuse of discretion in referring this issue to the master, and no procedural error is urged. The exceptions raising this point are without merit.

Dr. Langston's income was regularly deposited in a bank account on which Mrs. Langston drew all of the checks. In 1960 she opened a savings account in the Security Federal Savings and Loan Association, now Aiken Building and Loan Association, in their joint names and systematically deposited savings therein. This was continued over a period of years with Dr. Langston's full knowledge and approval. The case is the same as though the deposits of some $8,000.00 had been made initially by Dr. Langston, and we are not convinced that the court erred in holding that he intended a gift to Mrs. Langston of one-half of the account.

The Langston family had two automobiles, both of them registered in Dr. Langston's name. Mrs. Langston testified that a 1963 Pontiac station wagon, of which she had the exclusive use, had been ordered for her by Dr. Langston, in a color which she selected, and had been given to her as a present by him. This automobile is in Dr. Langston's possession. He also has Mrs. Langston's engagement ring. He testified that she had given the ring back to him. She testified that he secured possession of it when she inadvertently left it at the home. The

circuit court found that Mrs. Langston is the owner of both the automobile and the ring, and that they should be returned to her by Dr. Langston. The registration of the automobile in his name is not conclusive as to ownership, and the appellant has not convinced us that these findings by the circuit court are erroneous.

Modified and remanded for entry of a decree in conformity with the views herein expressed.

Moss, C. J., and Lewis, Bussey and Littlejohn, JJ., concur.

